Mr. Justice James
delivered the opinion of the court.
The original bill in this cause was filed by Keyser as Receiver, appointed under the national banking law of the German American National Bank, a corporation organized in the city of Washington. From the voluminous testimony taken on behalf of the several parties, we deduce the following conclusions:
On the 26th of January, 1876, the defendants, John Hitz and Jane C. Hitz, his wife, conveyed to Donaldson and Prentiss certain real estate, in Washington, which she had owned as a married woman before ■ the passage of what is known as the Married Woman’s Act of 1869, in trust to secure the payment of two promissory uotes, which had been dated of the 5th of the same month, each for the sum of $10,000, drawn by defendant Chipley, payable to the order of defendant, Halstead, in one and two years from date, with interest at the rate of ten per centum per annum. This •deed of trust provided that John Hitz, the husband, should ■occupy and take the rents and profits of the premises until ■default, and that upon final payment the release should be to him, his heirs and assigns. The notes were duly endorsed *520 by Halstead, to “ The German American Savings Bank,” a banking corporation in Washington, which was afterwards, on the 14th day of May, 1877, organized, by proper proceedings under the national banking law, as a national bank, under the name of “The German American National Bank, Washington ” The notes in question, with other assets of the savings bank became the property of the national bank.
The records of the bank show that a loan of $20,000 was made to Ghipley, the maker of these notes, on the 26th of January, 1876, the day of the date of the deed of trust, that deed being noted as the security. No such loan was made to Ghipley, and it is not shown that any money was paid out at that time to any person on account of this transaction. Ghipley an d Halstead were merely men of straw, and the use of a security made by them was a contrivance by which Hitz and Prentiss, two of the officers of this very extraordinary institution, proposed to conceal and at the same time provide for certain antecedent transactions. Hitz had incurred considerable liabilities to the bank, which it had become necessary to adjust, at the same time that the savings bank should be enabled to exhibit real estate securities based upon transactions in the customary form of its legitimate business. The actual transaction was indicated when Prentiss, on receiving the notes, wrote under Chipley’s signature, the number and name of Hitz’s post-office box; and it is established by the testimony that Hitz was the actual party and debtor in the transaction. The intent and the effect of the contrivance was to conceal from the public, and especially from the bank examiner, his improper liabilities to the concern in which he was an officer, to secure them by the usual real estate security, and to fix periods of credit by which the conversion and application of this security should be determined.
Afterwards, in the month of June, 1877, when the savings bank had been converted into a national bank, subject to the provisions of the national banking laws, and among others to that provision which required them to keep on hand a sum of money equal to twenty-five per centum of their notes *521 in circulation and of their deposits, the reserve fund of the German American National "Bank was in danger, and it became necessary to replace the Chipley notes and their real estate security with cash. Hitz, being advised that defend-' ant Tyler, as agent or broker for the defendant Jenks, had in his hands the sum of $20,000 for loan upon, real estate security in Washington, informed Tyler that he would in a few days be prepared to submit a proposition for that amount, in order to pay the Chipley notes. He explained that it would be dangerous to borrow and secure the money in his own name, and proposed to have the property transferred to some third person, and through that person to consummate the loan. Subsequently certain transactions were had. By a deed dated June-16, 1877, Donaldson and Prentiss, trustees in the deed which secured the Chipley notes, released the premises to Jane C. Hitz and her heirs, reciting that those notes were paid. On the same day a deed was prepared in which Mrs. Hitz appeared to be sole grantor, conveying the property to one Sarah L. Crane, for an alleged consideration of $40,000, which was not in fact paid. This deed was afterwards altered by erasures and re-writing, so as to include John Hitz as one of the grantors. The circumstances and effect of this alteration will be considered later. This deed wuis acknowledged by Mrs. Hitz on the 18th and by Mr. Hitz on the 20th of June. By a deed dated on the 20th Sarah L. Crane conveyed the premises to defendant Tyler, in trust to secure her promissory note of that date for the sum of $20,000, payable to the order -of John Hitz three years after date, with interest quarterly, at the rate of eight per centum per annum. This note was endorsed by Hitz, with waiver of-notice and protest. Pie thus made Ms liability absolute, and substantially made himself the actual debtor. Prentiss, who was cashier of the bank, made himself party to this negotiation. Some of the conveyances, notably that from Mrs. Hitz and her husband to Crane, were prepared under, his supervision and by his procurement. Throughout the transaction it was understood between Prentiss, acting for the bank, and Plitz, on one part, and Jenks, *522 through his agent, Tyler, on the other, that the original and first lien of the Chipley trust was to be got out of the way and extinguished, and that, to this end, the money lent by Jenks was to be immediately applied by the bank to the payment of the Chipley notes. In other words, although the loan was nominally made to Crane, it was understood to be substantially a loan to Hitz, or for his use, and that he was at the same time to turn the money over to the bank, in order that it might be at once applied to the satisfaction of the Chipley trust. In accordance with this understanding Jenks’ check on a Philadelphia bank for the amount of the loan was made payable to the order of, and was by Tyler delivered to Prentiss, as cashier, and it was by Prentiss’s endorsement made payable to the German American National Bank when he forwarded it to Philadelphia for collection. By this means this money went directly to the credit of the bank, and became part of its funds, but applicable, both as against Hitz and his wife and as against Jenks, solely to the payment of the Chipley notes. Prom that moment its application was fixed. It does not appear by the books of the bank that it was applied immediately, but as against the bank, and, therefore, as against the complainant, whose rights are only those of the bank, it must be treated by a court of equity as having been applied according to the contract under which it was received. Hence it must be held that the Chipley notes were satisfied on the 20th of June, 1877, if the Jenks loan was sufficient to pay what was due on them, provided the bank authorities could lawfully allow them to be paid in anticipation of maturity, and provided the bank was bound by the transaction carried out by its officers, Hitz and Prentiss. As a matter of fact, the interest on the Chipley notes had been paid at that time, so that the Jenks loan was precisely adequate to the payment of the principal. The question of the bank’s power and obligation will be considered.
The actual conduct of the bank officers in the subsequent treatment of the matter was certainly extraordinary. It appears from the bank books that Prentiss undertook to place *523 the money received from Jenks to his own credit in a certain trustee account which included other funds ; that for some time afterwards the Chipley notes appeared on the books, and were exhibited to the bank examiner, as living assets ; that in October, 1878, in two several entries, they were credited as paid, and that finally on the last day of that month, the day on which the bank went into the hands of the receiver, they were entered as “returned” to the list of assets ; in other words, as not paid. These book-keeping statements are entirely immaterial; but if they were material, the admission of payment, made by the bank against its own interest, must outweigh the subsequent statement made in its own favor ; especially when the later entry was made under suspicious circumstances. Their actual importance is that they confirm the testimony as to the nature of the contract under which the Jenks fund was received.
It is objected, however, by coniplaiuant, that the Jenks loan was made six months before the second of the Chipley notes was due ; that this note bore a high rate of interest, and that even the directors, and, a fortiori, the officers of the bank, could not make a valid contract to receipt payment in anticipation, because they stood in the strict relation to the stockholders and creditors of the bank of trustees of these notes, and because trustees cannot vary the terms of payment. Numerous cases were cited to ns in which the transactions of trustees have been held invalid because they departed in that way from the terms and limitations of the instrument which created the trust. We should give great weight to them if we supposed that the powers of the directors of a national bank were regulated by .the strict principle of a special trust. We think that they are not. It is true that these directors act in a fiduciary capacity, but they are trustees clothed by the statute with a power of management, and this power to manage the affairs of the bank implies a considerable element of discretion. We think that this discretion fully embraces a case in which cash, which is needed for the purpose and legitimate business of the bank, may be obtained for a debt which it holds, al *524 though that debt is not yet due. In this case the security was inherited from an institution whose business it was to lend money on real estate securities; but it was not the proper business of its successor, a national bank, to carry such investments, and it would seem to be a very proper act of discretion, in exercising the power of management, to convert such unavailable assets into money by accepting payment in anticipation. We hold, then, that there was no defect of power in the directors to make this transaction, and to bind the bank by a contract that the Jenks loan should be applied immediately to the extinction of the Chipley notes.
But it is objected further that, as a matter of fact, the directors never made any such contract, and that the officers who did make it were not empowered to do so either by virtue of their office or bj' special authorization. We think it is a sufficient answer to say that the bank received the money and cannot retain it except in accordance with the terms of the contract under which it was received. As to Jenks, it came.into the hands of the bank charged with a trust, and the retention of the fund must constitute an acceptance of the trust and at the same time a ratification of the acts of its officers.
If the Chipley notes were extinguished by this transaction, the complainant took nothing by Miss Crane’s deed of November 11th, 1878, purporting to convey the premises to him in trust to secure the payment of these notes. Not only was it an attempt to secure a 11011-existing debt, but it was made by one who was a naked trustee, without power to charge the property.
These view's dispose of the case of the receiver. He has no claim against this property. It remains to consider the case set up by Mrs. Hitz in her cross-bill and amended cross-bill. She alleges that the deed to Crane, in which she originally appeared to be the sole grantor,.was altered after she had executed and acknowledged it, so as to describe herself and her husband as grantors. Having inherited and held the premises as a married woman before the act of *525 1869, she claims that she continued to hold them as at common law after that act, and that the joinder or non-joinder of her husband in her deed was a very material matter ; so that an alteration, after she had executed and acknowledged it, was a very material alteration.
- It is not worth while to consider the questions touching the effect of a sole conveyance by a married woman, since the act of 1869, of real estate owmed by her before that enactment ; or touching the effect of alterations made without the knowledge of the grantor before delivery to the grantee, until we shall have considered the question of fact as to when the alteration was made. The scrivener who both prepared the original paper and made these alterations testifies that they were made before Mrs. Ilitz signed and acknowledged the deed. He had previously made an affidavit that she had both signed and acknowledged the instrument before they were made. That affidavit is not evidence as to the main question, and is brought out only as affecting the credibility of the witness. In his deposition, however,he is very positive as to his memory that the paper bore no signature when he altered it. A number of witnesses, including experts in processes and in the effect of mechauical processes, and lawyers who spoke from their professional habits and knowledge, were examined as to to the question whether the seal which accompanied Mrs. Iiitz’s acknowledgment was impressed above one of the erasures, or had itself suffered by the process of erasure, thus showing that the erasure was made after acknowledgment. We have very carefully examined both the testimony of the witnesses on this matter and the paper itself. It may be sufficient to state that most of the experts were of opinion that the seal was impressed after the erasures had been made. An allegation, or more properly, an accusation of this kind must be satisfactorily made out, in order to justify a court in holding a deed void for alteration ; and this charge has not been made out. Taking the testimony of the only witness who speaks from personal observation as to the presence or absence of a signature when he made the alteration, and the supporting testimony of *526 the experts, we are compelled to the conclusion that the alteration was made before execution and acknowledgment,, and, therefore, did not affect the validity of the deed. Even if this were doubtful, it is clear that it was made before delivery to the grantee, and while it was in the hands where Mrs. Hitz left it. There is nothing to show that the grantee knew or was charged to know that the alteration was made without the knowledgé and consent of the grantors.
Next, it was objected that the alleged consideration of $40,000 was never paid by Crane. As to Jenks, it'is immaterial whether it was paid or not. This conveyance was part of an entire arrangement by which a loan was to be secured on this land, and this arrangement supplied the consideration.
We think, then, that the complainant has no interest in this property in respect of the Chipley notes ; that the release of the original trust by Donaldson and Prentiss was valid; that the deed of Crane to complainant further to secure those notes must be candelled ; that the deed of Mrs. Hitz and her husband to Crane, and the deed of Crane to Tyler, in trust to secure Jenks, are valid; and that the trustee in the latter should be allowed to proceed to execute his trust.
It may be that, after payment of the note to Jenks, by sale of the premises, a surplus may remain to be disposed of. It is proper that the trustee be required, in case he makes sale and receives such surplus, to pay the latter into court. It appears, also, that a considerable amount of rents accruing from the premises has been collected and paid into court by the complainant. In the argument it was claimed on one hand that these sums should go to the creditors of Hitz. Eor the present, we do not dispose of either question, and this cause will be retained in order that the parties claiming to be interested may' litigate their lights by proper further proceedings.